Dan Stormer, Esq. [S.B. # 101967]
Brian Olney, Esq. [S.B. #298089]
Cathi Choi, Esq. [S.B. #342458]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
         bolney@hadsellstormer.com
         cchoi@hadsellstormer.com

Attorneys for Plaintiff
KARL AUGUSTUS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARL AUGUSTUS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES; CHIEF MICHEL MOORE; and DOES 1- 10.<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. 42 U.S.C. **§** 1983, 4th and 14th Amendments: Unreasonable Seizure<br><br>2. 42 U.S.C. **§** 1983, 4th and 14th Amendments: Unreasonable Search<br><br>3. 42 U.S.C. **§** 1983, 4th and 14th Amendments: Excessive Force<br><br>4. 42 U.S.C. **§** 1983, 4th and 14th Amendments: Failure to Intervene<br><br>5. Bane Act, Civil Code **§** 52.1<br><br>6. Assault<br><br>7. Battery By Peace Officer<br><br>8. Intentional Infliction of Emotional Distress<br><br>9. Negligence<br><br>**[DEMAND FOR JURY TRIAL]** |

COMPLAINT FOR DAMAGES

## I.  INTRODUCTION AND VENUE

1.      On June 11, 2021, officers with the Los Angeles Police Department ("LAPD") pulled over Karl Augustus—a Black 41-year-old military veteran with a history of PTSD—in the erroneous belief that Mr. Augustus' car might be stolen.  Even though Mr. Augustus was driving his own car, never presented any threat, complied with all police orders, and had committed no crime, he was surrounded by approximately ten officers, held at gunpoint, forced to lie face down in the middle of the street, handcuffed, and detained.

2.      The Officers acted pursuant to LAPD's written policy of using so-called "high risk" traffic stops—the same tactics LAPD uses to detain armed robbery and murder suspects—to detain motorists suspected only of stealing a vehicle, a property crime that is not high risk.  LAPD's policy is contrary to the standards and training of the Commission on Police Officer Standards and Training, which sets standards and training for California law enforcement, and is unconstitutional under Ninth Circuit law.

3.      Only after detaining Mr. Augustus for a significant period of time did the officers finally tell him that they had pulled him over believing that his vehicle was stolen but confirmed that it was not.  Another officer told Mr. Augustus that they had pulled him over because the license plate tags on his car were expired.

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.  Plaintiff's state-law claims form part of the same case and controversy and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in the United States District Court of the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) as the Central District is "a judicial district in which any defendant resides" and "all defendants are residents of the State in which the district is located."  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2),

as the Central District is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]"

### III.   PARTIES

6.      Plaintiff Karl Augustus resides in Los Angeles, California.  Mr. Augustus was making his early morning commute in his 2017 BMW 740 from his apartment on Olympic Boulevard and Olive Street to his gym in Hawthorne when LAPD officers pulled him over and conducted a "high risk" stop in which they drew their weapons, held him at gunpoint, forced him to lie on the street, violently handcuffed him, and held him in a lengthy detention in a police car while they searched his vehicle without his consent.

7.      Defendant Los Angeles ("the City") was and is a legal political entity established under the laws of the State of California, with all the powers specified and necessarily implied by the Constitution and laws of the State of California and exercised by a duly elected City Council and/or their agents and officers.  The City is responsible for the actions, inactions, policies, procedures, practices, and customs of the LAPD and its agents and employees. At all relevant times, the City was and continues to be responsible for assuring that the actions of the LAPD and its agents and employees comply with the Constitutions of the State of California and of the United States and any other applicable laws and regulations.

8.      Defendant Michel Moore is the duly appointed Chief of Police for the LAPD, and an employee of the City.  Defendant Moore holds the highest position in the LAPD and is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all LAPD employees and/or agents. At all relevant times herein, Defendant Moore was responsible for the promulgation of the policies and procedures and allowances of the practices and customs pursuant to which the acts of the Defendant Officers alleged herein were committed.  Defendant Moore is being sued in his individual capacity only.  On information and belief, Defendant Moore established and/or permitted the LAPD's policy, practice, custom,

1 and failure to train, and/or ratified the acts alleged herein.

2     9.     At least ten officers were involved in the incident.  Claimant is currently

3 unaware of their identities because the LAPD has refused all requests to provide

4 information concerning the incident.  Defendant Officers DOES 1-10 are employees of

5 the LAPD who were present for and participated in the incident.  Among other things,

6 Defendant Officer DOES participated in the high risk stop of Mr. Augustus and his *de*

7 *facto* arrest without probable cause, held Mr. Augustus at gunpoint, ordered him onto

8 his knees, ordered him to lie on the ground and prone out, violently handcuffed him,

9 detained him, searched his car without consent, and/or stood guard with the other

10 Officer Defendants while they committed these acts.

11     10.     Defendant Officers DOES 1-10 (collectively the "Officer Defendants")

12 engaged in the acts or omissions alleged herein under color of state law and within the

13 course and scope of their duties as Officers of the LAPD.  The Officer Defendants were

14 acting with the complete authority and ratification of their principal, Defendants City of

15 Los Angeles and Defendant Chief Michel Moore.

16     11.     Plaintiff is informed and believes and thereon alleges that at all times

17 relevant herein, Defendants and each of them were the agents, employees, servants,

18 joint venturers, partners, and/or co-conspirators of the other Defendants named in this

19 Complaint and that at all times, each of the Defendants was acting within the course and

20 scope of said relationship with Defendants.

21     12.     All of the acts and omissions complained of herein by Plaintiff against

22 Defendants were done and performed by said Defendants by and through their

23 authorized agents, servants and/or employees, all of whom at all relevant times herein

24 were acting within the course, purpose, and scope of said agency, service, and/or

25 employment capacity.  Plaintiff alleges that to the extent certain acts and omissions

26 were perpetrated by certain Defendants, the remaining Defendant or Defendants

27 confirmed and ratified said acts and omissions.

28     13.     Plaintiff is informed and believes and thereupon alleges, that at all times

COMPLAINT FOR DAMAGES          -3-

material herein, each Defendant was dominated and controlled by his/her co-Defendant and each was the alter-ego of the other.

14.     Whenever and wherever reference is made in this complaint to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly and severally.

## IV.     ADMINSITRATIVE PEREQUISITES

15.     Plaintiff Karl Augustus exhausted his administrative remedies by filing a governmental tort claim with the City of Los Angeles on December 6, 2021.  By correspondence dated December 22, 2021, the City rejected Plaintiff's governmental tort claim.

## V.     FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

16.     On June 11, 2021, around 2:30 a.m., Mr. Augustus was making his early morning commute in his 2017 BMW 740 from his apartment on Olympic Boulevard and Olive Street to his gym in Hawthorne.  Shortly after leaving his home, Mr. Augustus saw that a police vehicle was following him.  The police officer turned on his vehicle's red and blue lights and Mr. Augustus quickly pulled over at the intersection of Pico Boulevard and Grand Avenue.

17.     Mr. Augustus rolled down his window in anticipation of an officer walking up to his car.  Instead, an officer commanded Mr. Augustus over a loudspeaker to turn off his car, throw his keys out the window, place both hands out of his window, open the door slowly with his left hand, and exit the vehicle, facing away from the officer.  Mr. Augustus glanced back and saw more police cars pulling up and officers dismounting from their cars with their firearms drawn.

18.     Mr. Augustus threw his keys out the driver's side window, keeping both his hands outside the window so that both hands would be visible to the officers.  He then told the officers that he needed to reach back into the car to unbuckle his seatbelt.  The officers screamed loudly at Mr. Augustus, commanding him to exit the car.  Mr.

Augustus reached back to unbuckle his seatbelt with his right hand and kept his left hand outside the window so that the officers would see that his left hand was outside the vehicle.  Mr. Augustus feared that he would be shot.

19.    After unbuckling his seatbelt, Mr. Augustus put his right hand back outside the window so both hands were visible to the officers, slowly used his left hand to open the door from the outside, and exited the vehicle as he had been ordered to do.  Mr. Augustus tried to move as slowly and as fluidly as possible because he thought the officers might shoot him if they thought he was making any fast or sudden movements.

20.    After Mr. Augustus opened the door and exited his vehicle, an officer directed him to sidestep into the middle of the street while facing away from the officers with his hands above his head and commanded him to drop to his knees then lie down on the ground on his stomach.  The officer then commanded Mr. Augustus to prone out by extending his arms to the side, spread his legs, and turn his head away from the vehicle.  Mr. Augustus followed all the officer's directions.

21.    While lying on the ground, Mr. Augustus heard a helicopter circling overhead.  Mr. Augustus is a military veteran, and the sound of the helicopter reminded him of his experiences in combat loading wounded and dead soldiers onto Blackhawk helicopters that were deployed to medically evacuate soldiers on the battlefield.  This memory triggered his combat-related post-traumatic stress disorder ("PTSD").

22.    Mr. Augustus heard several officers repeatedly yell at the car, "Passenger, exit the vehicle!"  However, Mr. Augustus had no passengers with him.  His wife, who was then seven-months pregnant with their first child, was back in their apartment.  He wondered whether he would ever see her again and whether he would live to see the birth of his child.

23.    Mr. Augustus felt an officer grab his arms and place his wrists in cold and extremely tight handcuffs.  Two officers pulled Mr. Augustus up to his feet, turned him around, and took him towards the swarm of LAPD vehicles and officers standing nearby with their firearms drawn.  Mr. Augustus saw at least one officer pointing a gun

at him.  Mr. Augustus told the officers that he had a pregnant wife at home, that he was a military veteran, and that he had done nothing wrong.  Mr. Augustus asked the officers what they thought he had done. The officers refused to answer his question.

24.     The officers took Mr. Augustus to a patrol car, made him face the hood of the car on the driver's side of the car, and handcuffed his hands behind his back.  He saw officers searching his vehicle.  Mr. Augustus again asked the officers what was going on, but no officer would answer him.

25.     The handcuffs were so tight that Mr. Augustus lost sensation in his fingers. He told the officers that the handcuffs were too small for his body size and asked them to loosen the handcuffs.  Eventually an officer used a second set of handcuffs to extend and put distance between Mr. Augustus's wrists but did not loosen the handcuffs which were still very tight.  Mr. Augustus's fingers were still numb, even after the application of the second set of handcuffs.

26.     Mr. Augustus asked an officer once again why he had been pulled over. An officer finally told him that he had been pulled over for driving a stolen car.  The officers asked Mr. Augustus where he got the car from and how long he had had it.  Mr. Augustus said that the car was not stolen and that he bought it in 2020 in Atlanta, Georgia.

27.     Mr. Augustus urged the officers to check his car's Vehicle Identification Number to verify that it matched his Progressive Insurance Card on the application on his smart phone.  Mr. Augustus' car has out-of-state license plate tags from Georgia. After confirming that the car did in fact belong to Mr. Augustus, the officers changed their story and said that they had pulled him over because the license plate tags on his car were expired and when they ran his tags through the system, the tags were associated with a Blue Dodge Challenger.  Mr. Augustus said he had traded in a Blue Dodge Challenger in order to purchase his BMW and asked the officer if his name was listed for the Blue Dodge Challenger.  The officer did not respond.

28.     Throughout the entire incident, none of the officers wore face masks.  Mr.

COMPLAINT FOR DAMAGES                    -6-

Augustus had a face mask in his vehicle but the officers did not give him an opportunity to put it on.

29.     After a lengthy period of time, the officers finally released Mr. Augustus from the handcuffs.  Mr. Augustus's wrists swelled up from the tightness of the handcuffs.  An officer told Mr. Augustus to use the temporary paper license tags from the dealership.  Mr. Augustus stated that the dealership tags were expired.

30.     The officer told Mr. Augustus that the officers had acted pursuant to LAPD procedure and that he should get his license plates fixed.  The officers did not provide Mr. Augustus any written citation or other documentation for the incident.

31.     The California Law Enforcement Telecommunications System ("CLETS") is a statewide computer network used by law enforcement to search vehicle records, among other databases. On information and belief, the Defendant Officers conducted the high risk traffic stop based on information they received from CLETS indicating that Mr. Augustus's license plates did not match his vehicle, which the officers then assumed meant the vehicle might be stolen.  Without any further reasonable suspicion beyond this information from CLETS, and without any probable cause to believe that Mr. Augustus was involved in any criminal activity, let alone criminal activity posing any high risk of danger, Defendant Officers conducted a highly aggressive and terrifying "high risk" traffic stop.

32.     The Fourth Amendment to the United States Constitution prohibits unreasonable seizures.  U.S. Const. amend. IV; *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996).  Article I, § 13 of the California Constitution provides a similar prohibition.  Cal. Const. Art. I, § 13; *see People v. Perry*, 36 Cal. App. 5th 444, 466 (2019).

33.     "Under settled Fourth Amendment law, a traffic stop constitutes a seizure, and an officer must have reasonable suspicion before detaining a motorist." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 946 (9th Cir. 2003).  To lawfully arrest a motorist, however, an officer must have probable cause. *Green v. City & County of San*

*Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).

34.    Under Ninth Circuit law, "high risk" vehicle stops in which multiple officers hold a person at gunpoint, force the person down onto their knees, and handcuff the person constitute a *de facto* arrest requiring probable cause. *See id.* at 1047.

35.    Ninth Circuit law thus limits the use of such "high risk" detentions only to "special circumstances" "1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur." *Id.*  None of these special circumstances was present here.

36.    Police officers in California use CLETS to determine whether a particular vehicle may be stolen.  Police officers in Los Angeles and throughout California have been expressly warned that information in CLETS identifying a vehicle as potentially stolen is not sufficient to establish probable cause:

> Information obtained from CLETS can be used by peace officers to establish or reinforce the *reasonable suspicion* necessary to *lawfully detain a suspect*. Because the information may be unreliable or unsubstantiated, however, *it is not sufficient **alone*** for establishing the probable cause necessary for law enforcement actions such as conducting a search, seizing property, or placing an individual under arrest.

California Commission on Peace Officer Standards and Training (POST), Learning Domain 36 (Information Systems), Version 3.6, at 1-9 (emphasis in original).  For this reason, California Department of Justice regulations *require* that officers "obtain confirmation before an arrest or the confiscation of the property in response to the computer match." *Id.*  Officers are also trained that "[t]he use of unreliable or unsubstantiated information by an officer when establishing probable cause could lead to unlawful searches or seizures as well as incidents of false arrest." *Id.*

37.    The involved Officers' highly aggressive tactics were pursuant to the LAPD's written policy and training to use such so-called "high risk" or "felony" traffic stop procedures based only upon suspicion of any felony, including a suspected a stolen

1  vehicle.

2  38.    The LAPD's high risk traffic stop policy violates the Fourth Amendment

3  and Article I, § 13 of the California Constitution.  The involved officers, acting pursuant

4  to Departmental policy and training, performed a high risk stop on Mr. Augustus based

5  only on information in CLETS indicating that Mr. Augustus' vehicle did not match his

6  license plates, which the officers assumed meant the vehicle might be stolen.  Without

7  verifying whether this report was correct, at least ten officers surrounded Mr. Augustus

8  and used the "especially intrusive" tactics of drawing and pointing firearms, forcing Mr.

9  Augustus to lie down on his stomach in the middle of the street, aggressively

10  handcuffing him, and detaining him in the back of a police car even though none of the

11  "special circumstances" required to justify such aggressive tactics were present.

12  Significantly, the LAPD's written policy on high risk stops states that such stops are

13  "utilized when officers have the reasonable belief that the occupants in the vehicle may

14  be armed and may represent a serious threat to the officer, or have committed a felony."

15  Whether the LAPD's policy requires or even simply permits the use of such tactics

16  based only upon suspicion of a stolen vehicle, the policy is unconstitutional.

17  39.    The egregious nature of LAPD's high risk stop policy is further

18  underscored by the fact that among the 3,524 traffic stops performed by the LAPD

19  based on suspicion of a stolen vehicle between 2018 and 2021, the vehicle was not

20  actually stolen in 74 percent of the stops.

21  40.    Mr. Augustus has been seriously traumatized by LAPD's aggressive and

22  life-threatening high risk traffic stop policy and tactics.  Mr. Augustus sought

23  counseling following the incident to cope with the resulting anxiety, nightmares,

24  insomnia, and depression.  He has been unable to concentrate at work.  The incident

25  undid years of progress Mr. Augustus had made treating his PTSD.  He no longer trusts

26  the police and fears they pose a threat to his life.

27  41.    Plaintiff brings this action for damages against Defendants for general,

28  compensatory, and statutory damages, costs and attorneys' fees based on Defendants'

unlawful and egregious conduct, as alleged herein.  Plaintiff also seek declaratory and injunctive relief enjoining the LAPD's policy requiring, or in the alternative authorizing, "high risk" stops prohibited by Ninth Circuit law.  Additionally, Plaintiff seeks punitive damages against the individual Defendants.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983

### Fourth and Fourteenth Amendments: Unreasonable Seizure

### (By Plaintiff Against All Defendants)

42.    Plaintiff alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

43.    All of the acts of Defendant Officers DOES 1-10 were done under color of state law.

44.    The acts of the Officer Defendants deprived Plaintiff of rights, privileges, and immunities secured by the Constitution of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states and their local governments by the Fourteenth Amendment by, among other things, unlawfully seizing Plaintiff by conducting a high risk traffic stop and a *de facto* arrest of Plaintiff without any lawful basis, probable cause, warrant, or any exception thereto, and unreasonably prolonging Plaintiff's detention even after the officers knew or reasonably should have known that Plaintiff had not stolen his vehicle.

45.    Each of the Officer Defendants was both personally involved and an integral participant in the violation of Plaintiff's constitutional rights.  Each Officer was aware of the unlawful actions of the other Officers as they planned to and did conduct a "high risk" stop of Plaintiff without any further reasonable suspicion beyond unverified information from CLETS indicating that Plaintiff's vehicle did not match its license plates, and without any probable cause to believe that Mr. Augustus was involved in

any criminal activity, let alone criminal activity posing any high risk of danger, and performed a *de facto* arrest of Mr. Augustus without probable cause, held him at gunpoint, ordered him to lie proned out in the middle of the street, violently handcuffed him, detained him, and/or stood guard while the other Officer Defendants committed these acts.  None of the involved Officers objected to these violations of Plaintiff's rights, and each Officer participated in the violation by performing police functions, including meaningful participation in the unlawful seizure and *de facto* arrest of Plaintiff and the use of unreasonable force against him.

46.    As a direct and proximate result of the aforementioned acts of the Officer Defendants, Plaintiff sustained and incurred damages including pain, suffering, and emotional injury.

47.    In doing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for Plaintiff's constitutional rights.  The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Officer Defendant in their individual capacities (but not against the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

48.    The Officer Defendants and any other involved officers acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Los Angeles.  These include policies and longstanding practices and/or customs requiring and/or permitting officers to carry out "high risk" stops, including but not limited to utilizing large numbers of police cars and officers; drawing their weapons and pointing firearms at people; forcing people onto their knees and/or proning them out; handcuffing them; and detaining them at length, all in situations that are not high risk and based only upon reasonable suspicion of property crimes such as suspected stolen vehicles and without regard to Ninth Circuit law.

49.    The training policies of the City of Los Angeles were not adequate to train, supervise, and control its Officers to handle the usual and recurring situations with

COMPLAINT FOR DAMAGES                    -11-

which they must deal, including but not limited to performing (1) high risk traffic stops of vehicles suspected of being stolen based only upon unconfirmed CLETS data and (2) *de facto* arrests of motorists based only upon same.  The City of Los Angeles knew that its failure to adequately train its Officers for such situations made it highly predictable that its Officers would engage in conduct that would deprive persons such as Mr. Augustus of his rights.  The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its Officers adequately.

50.    Defendant City of Los Angeles's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Mr. Augustus by Defendant Officers DOES 1-10, and the other involved Officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused his injuries.  These policies, longstanding practices, and/or customs include performing high risk traffic stops of vehicles suspected of being stolen.

51.    LAPD Chief Michel Moore, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983

### Fourth and Fourteenth Amendments: Unreasonable Search

### (By Plaintiff Against All Defendants)

52.    Mr. Augustus realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

53.    All of the acts of Defendant Officers DOES 1-10 were done under color of

1  state law.

2  54.    The acts of the Officer Defendants deprived Mr. Augustus of rights,

3  privileges, and immunities secured by the Constitution and laws of the United States,

4  including but not limited to his rights under the Fourth Amendment of the United States

5  Constitution, incorporated and made applicable to the states and their local governments

6  by the Fourteenth Amendment, by, among other things, searching Mr. Augustus'

7  vehicle without a warrant, exigency, emergency, probable cause, or Plaintiff's consent.

8  55.    Each of the Officer Defendants was both personally involved and an

9  integral participant in the violation of Mr. Augustus' constitutional rights.  Each Officer

10  was aware of the unlawful actions of the other Officers as they planned to search and

11  did search Mr. Augustus' vehicle; did not object to this violation of Mr. Augustus'

12  rights; and participated in the violation by performing police functions, including

13  meaningful participation in the unlawful traffic stop, *de facto* arrest, search, and use of

14  unreasonable force against Plaintiff.

15  56.    As a direct and proximate result of the aforementioned acts of the Officer

16  Defendants, Plaintiff sustained and incurred damages including emotional injury.

17  57.    In doing the foregoing wrongful acts, Defendants, and each of them, acted

18  in reckless and callous disregard for Plaintiff's constitutional rights.  The wrongful acts,

19  and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting

20  the award of punitive damages against each individual Officer Defendant in their

21  individual capacities (but not against the entity Defendant) in an amount adequate to

22  punish the wrongdoers and deter future misconduct.

23  58.    The Officer Defendants and any other involved officers acted pursuant to

24  expressly adopted official policies or longstanding practices or customs of the City of

25  Los Angeles.  These include policies and longstanding practices and/or customs

26  requiring and/or permitting officers to carry out "high risk" stops, including but not

27  limited to utilizing large numbers of police cars and officers, drawing their weapons and

28  pointing firearms at people, forcing people onto their knees, handcuffing them,

COMPLAINT FOR DAMAGES            -13-

detaining them at length, and searching their vehicles, all in situations that are not high risk and based only upon reasonable suspicion of property crimes such as suspected stolen vehicles and without regard to Ninth Circuit law.

59.   The training policies of the City of Los Angeles were not adequate to train, supervise, and control its Officers to handle the usual and recurring situations with which they must deal, including but not limited to performing high risk traffic stops of vehicles suspected of being stolen based only upon unconfirmed CLETS data and searching the vehicle based only upon same.  The City of Los Angeles knew that its failure to adequately train its Officers for such situations made it highly predictable that its Officers would engage in conduct that would deprive persons such as Plaintiff of his rights.  The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its Officers adequately.

60.   Defendant City of Los Angeles's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Plaintiff by the Officer Defendants and the other involved Officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused his injuries.

61.   LAPD Chief Michel Moore, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Officer Defendants and the other involved Officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.

/ / /

/ / /

/ / /

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983**

**Fourth and Fourteenth Amendments: Excessive Force**

**(By Plaintiff Against All Defendants)**

62.     Mr. Augustus realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

63.     All of the acts of Defendant Officers DOES 1-10 were done under color of state law.

64.     The acts of the Officer Defendants deprived Plaintiff of rights, privileges, and immunities secured by the Constitution of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states and their local governments by the Fourteenth Amendment by, among other things, using excessive force against Plaintiff. Specifically, Defendants pointed their guns at Plaintiff, which under established Ninth Circuit law is a use of force. Defendants also forced Plaintiff to prone out in the middle of the street, and applied handcuffs so tightly that Plaintiff's fingers became numb.

65.     Each of the Officer Defendants was both personally involved and an integral participant in the violation of Plaintiff's constitutional rights. Each Officer was aware of the unlawful actions of the other Officers as they planned to and did point their firearms at Plaintiff, forced Plaintiff to kneel and prone out in the middle of the street, and forcefully handcuffed Plaintiff. None of the Officers objected to these violations of Plaintiff's rights, and each Officer participated in the violation by performing police functions, including meaningful participation in the unlawful traffic stop, *de facto* arrest, and use of unreasonable force against Plaintiff.

66.     As a direct and proximate result of the aforementioned acts of the Officer Defendants, Plaintiff sustained and incurred damages including pain, suffering, and emotional injury.

67.     In doing the foregoing wrongful acts, Defendants, and each of them, acted

in reckless and callous disregard for Plaintiff's constitutional rights.  The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Officer Defendant in their individual capacities (but not against the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

68.     The Officer Defendants and any other involved officers acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Los Angeles.  These include policies and longstanding practices and/or customs requiring and/or permitting officers to carry out "high risk" stops involving excessive force, including but not limited to utilizing large numbers of police cars and officers, drawing their weapons and pointing firearms at people, forcing people onto their knees, tightly handcuffing them, and detaining them at length, all in situations that are not high risk and based only upon reasonable suspicion of property crimes such as suspected stolen vehicles and without regard to Ninth Circuit law.

69.     The training policies of the City of Los Angeles were not adequate to train, supervise, and control its Officers to handle the usual and recurring situations with which they must deal, including but not limited to performing high risk traffic stops of vehicles suspected of being stolen based only upon unconfirmed CLETS data and using excessive force based only upon same.  The City of Los Angeles knew that its failure to adequately train its Officers for such situations made it highly predictable that its Officers would engage in conduct that would deprive persons such as Plaintiff of his rights.  The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its Officers adequately.

70.     Defendant City of Los Angeles's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Plaintiff by Defendant Officers DOES 1-10, and the other involved Officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of

Plaintiff's rights as to be the moving force that caused his injuries.

71.     LAPD Chief Michel Moore, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983**

**Fourth and Fourteenth Amendments: Failure to Intervene**

**(By Plaintiff Against All Defendants)**

72.     Mr. Augustus realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

73.     All of the acts of Defendant Officers DOES 1-10 were done under color of state law.

74.     The acts of the Officer Defendants deprived Plaintiff of rights, privileges, and immunities secured by the Constitution of the United States, including but not limited to their rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states and their local governments by the Fourteenth Amendment by, among other things, failing to intervene in the unlawful actions of other Officers.  These unlawful actions include the unreasonable traffic stop of Plaintiff, the unlawful *de facto* arrest of Plaintiff, the unlawful search of Mr. Augustus' vehicle, and the use of excessive force against Plaintiff, including Defendants drawing their guns and with at least one officer pointing his gun at Plaintiff, forcing Plaintiff to lie down on his stomach and prone out in the middle of the street, applying handcuffs so tightly that Plaintiff's fingers started to go numb, and detaining Plaintiff for an extended period of time.

75.     At all relevant times, the Officer Defendants were present and had a

realistic opportunity to intervene and prevent the unlawful traffic stop, *de facto* arrest, search, and excessive force by their fellow Officers against Plaintiff, but neglected to do so.

76.     As a direct and proximate result of the aforementioned acts and omissions of the Officer Defendants, Plaintiff sustained and incurred damages including pain, suffering, and emotional injury.

77.     In doing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for Plaintiff's constitutional rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Officer Defendant in their individual capacities (but not against the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

78.     The Officer Defendants and any other involved officers acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Los Angeles. These include policies and longstanding practices and/or customs requiring and/or permitting officers to carry out "high risk" stops, including but not limited to utilizing large numbers of police cars and officers, drawing their weapons and pointing firearms at people, forcing people to lie on their stomachs and prone out in the middle of the street, handcuffing them, detaining them at length, and searching their vehicles, all in situations that are not high risk and based only upon reasonable suspicion of property crimes such as suspected stolen vehicles and without regard to Ninth Circuit law. These official policies and longstanding practices and/or customs also include failure to intervene in said activities.

79.     The training policies of the City of Los Angeles were not adequate to train, supervise, and control its Officers to handle the usual and recurring situations with which they must deal, including but not limited to failing to intervene to stop unlawful seizures, unlawful searches, and the use of excessive force, including carrying out "high risk" stops utilizing large numbers of police cars and officers, drawing and pointing

firearms at people, forcing people to lie on their stomachs and prone out in the middle of the street, detaining them at length, and searching their vehicles, all in situations that are not high risk and based only upon reasonable suspicion of property crimes such as suspected stolen vehicles and without regard to the Ninth Circuit law.  The City of Los Angeles knew that its failure to adequately train its Officers for such situations made it highly predictable that its Officers would fail to intervene to stop constitutional violations by their fellow Officers that deprive persons such as Plaintiff of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its Officers adequately.

80.     Defendant City of Los Angeles's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Plaintiff by Defendant Officers DOES 1-10, and the other involved Officers; that is, the City of Los Angeles's official policies and/or longstanding practices or customs are so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused their injuries.

81.     LAPD Chief Michel Moore, a final policymaker for the City of Los Angeles, ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions, including their failure to intervene to stop the unlawful acts of their fellow officers.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.

**FIFTH CLAIM FOR RELIEF**

**BANE ACT, CIVIL CODE § 52.1**

**(By Plaintiff Against All Defendants)**

82.     Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

83.     Article I, § 13 of the California Constitution and the Fourth Amendment to

the United States Constitution, incorporated and made applicable to the states and their local governments by the Fourteenth Amendment, guarantee the right of persons to be free from unlawful false arrests, unlawful searches, and excessive force on the part of law enforcement officers.  The Officer Defendants and the other involved Officers, by engaging in the wrongful acts and failures to act alleged herein, intentionally and deliberately denied each of these rights to Plaintiff by threats, intimidation, or coercion, to prevent Plaintiff from exercising his rights to be free of false arrest, unlawful searches, and excessive force, thus giving Plaintiff claims for damages pursuant to California Civil Code § 52.1.  Specifically, the Officer Defendants and other involved Officers unlawfully (1) stopped Plaintiff based only upon unverified information from CLETS indicating that Plaintiff's vehicle might be stolen, (2) performed a *de facto* arrest of Plaintiff, (3) searched Plaintiff's vehicle without Plaintiff's consent, (4) used excessive force against Plaintiff, including pointing their guns at Plaintiff, forcing Plaintiff to lie on his stomach and prone out in the middle of the street, and (5) applying handcuffs so tightly that they made Plaintiff's fingers go numb.  The Officer Defendants intended by their actions to deprive Plaintiff of his enjoyment of the interests protected by the right to be free of such conduct.

84.　　As a direct and proximate result of the aforementioned acts and omissions of the Officer Defendants, Plaintiff sustained and incurred damages including pain, suffering, and emotional injury.

85.　　Each of the Officer Defendants was both personally involved and aided and abetted in the violation of Plaintiff's constitutional rights.  Each Officer knew that the other Officers were committing unlawful actions against Plaintiff as they planned to and did unlawfully arrest Plaintiff, search Plaintiff's vehicle, use excessive force against Plaintiff, and detain Plaintiff.  Each Officer gave substantial assistance or encouragement to the other Officers and each Officer's conduct was a substantial fact in causing harm to Plaintiff.

86.　　LAPD Chief Michel Moore, a final policymaker for the City of Los

Angeles, approved and/or ratified the unconstitutional policy guiding the Officer Defendants' unlawful acts, and approved and/or ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.  The City of Los Angeles is vicariously liable for its Officers' misconduct.

87.    In doing the foregoing wrongful acts, Defendants, and each of them, acted with conscious disregard of Plaintiff's rights.  Said Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages against each individual Officer Defendant in their individual capacities (but not against the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

88.    As the direct and legal result of Defendants' conduct, Plaintiff suffered and will continue to suffer damages, including but not limited to those set forth above, and is entitled to statutory damages under Cal. Civ. Code § 52, including damages up to three times Plaintiff's actual damages but no less than $4,000 for every offense of California Civil Code § 51 *et seq.*, as well as compensatory and punitive damages and attorneys' fees.

**SIXTH CLAIM FOR RELIEF**

**ASSAULT**

**(By Plaintiff Against All Defendants)**

89.    Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

90.    Officer Defendants drew their weapons and aimed them at Plaintiff's person in a threatening manner.

91.    Plaintiff reasonably believed that Officer Defendants would shoot him.

92.    Plaintiff did not consent to Officer Defendants' conduct.

93.     As a direct and proximate result of the aforementioned acts or omissions of Officer Defendants, Plaintiff has suffered and continues to suffer emotional injury.

94.     Upon information and belief, each of the Officer Defendants was either personally involved and/or aided and abetted in the violation of Plaintiff's constitutional rights.  Each Officer knew that the other Officers were committing unlawful actions against Plaintiff as they planned to and did unlawfully aim their weapons at Plaintiff. Each Officer gave substantial assistance or encouragement to the other Officers and each Officer's conduct was a substantial fact in causing harm to Plaintiff.

95.     LAPD Chief Michel Moore, a final policymaker for the City of Los Angeles, approved and/or ratified the unconstitutional policy guiding the Officer Defendants' unlawful acts, and approved and/or ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.

96.     The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

97.     In doing the foregoing wrongful acts, Defendants, and each of them, acted with conscious disregard of Plaintiff's rights.  Said Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages against each individual Officer Defendant in their individual capacities (but not against the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**SEVENTH CLAIM FOR RELIEF**

**BATTERY BY PEACE OFFICER**

**(By Plaintiff Against All Defendants)**

98.     Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

99.    Defendant Officers intentionally touched Plaintiff including forcefully handcuffing him, forcing him to prone out in the middle of the street, and putting the handcuffs on so tightly that Plaintiff's hands went numb.

100.    Defendants Officers used unreasonable force while intentionally touching Plaintiff.

101.    Plaintiff did not consent to the Officers' uses of force.

102.    Plaintiff was harmed by the Officers' uses of force, which has caused him to suffer injuries including pain, suffering, and emotional injuries.

103.    Each of the Officer Defendants was either personally involved and/or aided and abetted in the violation of Plaintiff's constitutional rights.  Each Officer knew that the other Officers were committing unlawful actions against Plaintiff as they planned to and did use excessive force against Plaintiff.  Each Officer gave substantial assistance or encouragement to the other Officers and each Officer's conduct was a substantial fact in causing harm to Plaintiff.

104.    As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiff sustained pain, suffering, and emotional injury.

105.    LAPD Chief Michel Moore, a final policymaker for the City of Los Angeles, approved and/or ratified the unconstitutional policy guiding the Officer Defendants' unlawful acts, and approved and/or ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.

106.    The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

107.    In doing the foregoing wrongful acts, Defendants, and each of them, acted with conscious disregard of Plaintiff's rights.  Said Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of exemplary and

COMPLAINT FOR DAMAGES                    -23-

punitive damages against each individual Officer Defendant in their individual capacities (but not against the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**EIGHTH CLAIM FOR RELIEF**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(By Plaintiff Against All Defendants)**

108.   Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

109.   Officer Defendants' actions performing a "high risk" stop of Plaintiff, drawing their guns, pointing their weapons at Plaintiff, forcing Plaintiff to lie proned out in the street, violently handcuffing Plaintiff, detaining Plaintiff, and searching vehicle, was outrageous.  This conduct was performed with reckless disregard to the effect that these actions and omissions would have upon Plaintiff, including emotional distress.

110.   As a direct and proximate result of the aforementioned acts or omissions of Officer Defendants, Plaintiff suffered injuries including pain, suffering, and severe emotional injury.

111.   LAPD Chief Michel Moore, a final policymaker for the City of Los Angeles, approved and/or ratified the unconstitutional policy guiding the Officer Defendants' unlawful acts, and approved and/or ratified the actions and omissions of the Defendant Officers and the other involved officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions.  Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved Officers have been disciplined.

112.   The City of Los Angeles is vicariously liable for the actions of the Officer Defendants.

113.   In doing the foregoing wrongful acts, Defendants, and each of them, acted with conscious disregard of Plaintiff's rights.  Said Defendants' conduct was willful,

wanton, malicious, and oppressive, thereby justifying an award of exemplary and punitive damages against each individual Officer Defendant in their individual capacities (but not against the entity Defendant) to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**NINTH CLAIM FOR RELIEF**

**NEGLIGENCE**

**(By Plaintiff Against All Defendants)**

114.   Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

115.   The conduct of the Officer Defendants as set forth herein, was tortious in that Defendants breached their duty of care to Plaintiff, an unarmed man besieged by at least seven police officers, when the Officer Defendants performed a "high risk" stop, searched Plaintiff's vehicle, used excessive force against Plaintiff including by proning him out in the middle of the street, pointing guns at him, violently handcuffing him, and detaining him in a police car for a lengthy period of time.

116.   The City failed to appropriately hire, supervise, train, review, and ensure that their Officers abided by the standard of care, failed to enact appropriate standards and procedures that would have prevented such harms to Plaintiff, including failing to train LAPD Officers (1) not to use high risk traffic stops based only on suspicion of a stolen vehicle arising from unverified CLETS data, and (2) not to use excessive force or perform *de facto arrests* or vehicular searches in situations where such actions are not justified.

117.   Each of the Officer Defendants was either personally involved and/or aided and abetted in the breach of a duty to care toward Plaintiff.  Each Officer knew that the other Officers were committing unlawful actions against Plaintiff as they planned to and did unlawfully arrest Plaintiff, search Plaintiff's vehicle, use excessive force against Plaintiff, and detain Plaintiff in a police car.  Each Officer gave substantial assistance or encouragement to the other Officers and each Officer's conduct was a substantial fact in

1    causing harm to Plaintiff.

2         118.   As a direct and proximate result of Defendants' conduct as alleged herein,

3    Plaintiff sustained and incurred physical and emotional damages.

4         119.   LAPD Chief Michel Moore, a final policymaker for the City of Los

5    Angeles, approved and/or ratified the unconstitutional policy guiding the Officer

6    Defendants' unlawful acts, and approved and/or ratified the actions and omissions of

7    the Defendant Officers and the other involved officers in that he had knowledge of and

8    made a deliberate choice to approve their unlawful acts and omissions.  Upon

9    information and belief, the City took no action in response to Plaintiff's allegations and

10   none of the involved Officers have been disciplined.

11        120.   The City of Los Angeles is vicariously liable for the actions of the Officer

12   Defendants.

13        121.   In doing the foregoing wrongful acts, the Officer Defendants, and each of

14   them, acted with conscious disregard of Plaintiff's rights.  Said Defendants' conduct

15   was willful, wanton, malicious, and oppressive, thereby justifying an award of

16   exemplary and punitive damages against each individual Officer Defendant in their

17   individual capacities (but not against the entity Defendant) to punish the wrongful

18   conduct alleged herein and to deter such conduct in the future.

**PRAYER FOR RELIEF**

19
20        WHEREFORE, Plaintiff prays for the following relief:

21        1.     For compensatory, general and special damages against each Defendant,

22   jointly and severally, amounts to be proven at trial;

23        2.     For punitive and exemplary damages against individually named

24   Defendant Chief of Police Michel Moore and Defendant Officers DOES 1-10 in their

25   individual capacities and in an amount appropriate to punish Defendants and deter

26   others from engaging in similar misconduct;

27        3.     Prejudgment and post-judgment interest;

28        4.     For costs and suits and reasonable attorneys' fees and costs as authorized

COMPLAINT FOR DAMAGES                    -26-

by statute or law;

5.      For restitution as the Court deems just and proper;

6.      For injunctive and declaratory relief; and

7.      For such other relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury in this action.

Dated: April 20, 2022                          Respectfully Submitted,

HADSELL STORMER RENICK & DAI LLP


By:   ___/s/ Cathi Choi_____
         Dan Stormer
         Brian Olney
         Cathi Choi
Attorneys for Plaintiff