UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

KARL AUGUSTUS,

       Plaintiff,

v.

CITY OF LOS ANGELES et al.,

       Defendants.

Case No. 2:22-cv-02640-SB-AGR

ORDER DENYING CITY'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW [DKT. NO. 296] AND GRANTING IN PART PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS [DKT. NO. 288]

       This hard-fought case culminated in a jury verdict awarding Plaintiff Karl Augustus $150,000 against Defendant City of Los Angeles. The City filed a renewed motion for judgment as a matter of law, and Plaintiff seeks more than $1.3 million in attorneys' fees and non-taxable costs. Dkt. Nos. 288, 296. The Court vacated the hearings on the motions, Dkt. No. 314, and now finds these matters suitable for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15. Because a reasonable jury could find that the City's officers used excessive force when—acting pursuant to city policy—they surrounded Plaintiff and pointed their guns at him while he lay prone on the ground, complying with all orders, the City has not shown that the verdict should be disturbed. As the prevailing party, Plaintiff is entitled to recover his reasonable attorneys' fees and costs, although the Court awards less than the amount sought.

I.

       The facts of this case are familiar to the parties and are recounted in the Court's May 31, 2023 summary judgment order. Dkt. No. 97. Briefly, Plaintiff

failed to update his license plate or registration when he moved to California, and officers of the Los Angeles Police Department (LAPD) pulled him over in the early morning of June 11, 2021, suspecting that his vehicle might be stolen. Following LAPD policy, the officers conducted a high-risk stop involving a police helicopter and 13 officers. Although Plaintiff was unarmed, fully complied with all instructions, and never resisted or threatened the officers, several of the officers pointed their guns toward Plaintiff, forced him to lie prone on the ground, and handcuffed him. After searching the car and determining that it belonged to Plaintiff, they released him.

Plaintiff filed this case against the City and its police chief in April 2022, alleging claims under 42 U.S.C. § 1983 for unreasonable search and seizure, excessive force, and failure to intervene, along with several state-law claims. Dkt. No. 1. In August 2022, Plaintiff amended his complaint to add individual capacity claims against seven officers who participated in the high-risk stop. Dkt. No. 26. After extensive discovery disputes, Defendants moved for summary judgment, and Plaintiff sought partial summary judgment. The Court granted Defendants' motion in part, finding that the individual officers were entitled to summary judgment on most of Plaintiff's federal claims and two of the state claims and that the City was entitled to summary judgment on a subset of those claims. Dkt. No. 97. The Court found, however, that fact issues remained for trial on whether Plaintiff was unlawfully seized, whether portions of the officers' searches were unconstitutional, and whether the high-risk stop subjected Plaintiff to excessive force. The Court also granted partial summary judgment for Plaintiff against the City, finding as a matter of law that the officers had acted according to their training and LAPD policy when conducting the stop, such that the City's policy of using high-risk stops on suspected stolen vehicles was the moving force behind the officers' actions.

Although summary judgment narrowed the issues remaining for trial, the number of disputes before the Court multiplied in the following months. In the ten weeks between the Court's summary judgment ruling and the beginning of trial, approximately 120 docket entries were filed. The parties' inability to resolve their abundant disputes required the Court to hold five pretrial conferences and issue numerous rulings. To streamline the trial, Plaintiff ultimately voluntarily abandoned most of his claims that had survived summary judgment, including all claims against the individual Defendants. Plaintiff proceeded to trial only on his § 1983 excessive force and unlawful seizure claims against the City. After the jury deadlocked, the Court declared a mistrial on August 14, 2023. A poll of the jury revealed a 7–1 split in favor of Plaintiff.

The parties proceeded to trial a second time.  On August 25, 2023, the jury
returned a verdict for Plaintiff, awarding him $150,000 against the City.  Dkt. No.
281.  The Court entered final judgment on September 5, 2023.  Dkt. No. 285.  The
City now renews its motion for judgment as a matter of law, arguing that the
evidence at trial establishes that the officers had probable cause to arrest Plaintiff
and that their use of force was reasonable.  Dkt. No. 296.  Plaintiff seeks an award
of approximately $1.3 million in attorneys' fees and nontaxable costs.  Dkt. No.
288.

## II.

### A.

Rule 50(a) permits a party to move for judgment as a matter of law after the
close of evidence but before the case is submitted to a jury.  *Dupree v. Younger*,
598 U.S. 729, 731 (2023).  If the motion as denied—as the City's was in this
case—Rule 50(b) permits a renewed motion for judgment as a matter of law after
the jury renders an adverse verdict.  *Id*. at 732.  The standard for overturning a jury
verdict is "very high"; it requires a showing that there is no legally sufficient basis
for a reasonable jury to find for the prevailing party on the challenged issue.  *Costa
v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002).  The court must review
all evidence in the record, drawing all reasonable inferences in favor of the
nonmoving party, and may not make credibility determinations or weigh the
evidence.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).
Because Rule 50(b) permits only a renewed motion, "[a] party cannot raise
arguments in its post-trial motion for judgment as a matter of law under Rule 50(b)
that it did not raise in its pre-verdict Rule 50(a) motion."  *Freund v. Nycomed
Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

### B.

At the City's insistence, the Court instructed the jury to answer a single
question on liability that encompassed both of Plaintiff's claims:  "Has Plaintiff
proven by a preponderance of the evidence that any of the officers employed by
the City of Los Angeles violated his rights by either arresting him without probable
cause or using excessive force?"  Dkt. No. 281; *see also* Dkt. No. 201 (proposed

verdict form jointly submitted by the parties).[1]  Thus, to show that there is no legally sufficient basis for the jury's finding of liability, the City must show *both* that the officers did not arrest Plaintiff without probable cause *and* that they did not use excessive force against him.  Conversely, the verdict must stand if the evidence at trial could have permitted a finding of either unlawful seizure or excessive force.

Although the City focuses much of its briefing on arguing that the officers had probable cause to arrest Plaintiff, the Court need not resolve the parties' dispute on that claim because the evidence at trial permitted the jury to reasonably conclude that the officers used excessive force against Plaintiff.

The Fourth Amendment permits law enforcement officers to use "objectively reasonable" force to carry out stops and arrests, and "objective reasonableness is determined by an assessment of the totality of the circumstances."  *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The Ninth Circuit employs a three-step analysis in evaluating excessive force claims.  The first step is to assess the severity of the intrusion on the plaintiff's Fourth Amendment rights based on the type and amount of force inflicted.  *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).  Next, the court "must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape."  *Id*.  Finally, the intrusion on the plaintiff must be balanced against the government's need for the intrusion.  *Id*.  Whether an officer's use of force to effect an arrest was reasonable is a fact-specific inquiry that "should only be taken from the jury in rare cases."  *Green*, 751 F.3d at 1049.

In *Green*, as many as six officers directed the plaintiff to her knees while pointing weapons in her direction and searched the plaintiff and her car over 20 minutes (10 of them while the plaintiff was handcuffed).  On those facts, the Ninth Circuit stated that "[t]here is no question that the degree of intrusion here was severe."  *Id*.  As this Court observed in denying summary judgment, the detention of Plaintiff in this case was even more intrusive than in *Green*.  Plaintiff was

---

[1] The Court suggested that the liability question should be split into two parts so that the parties and the Court would be able to know how the jury determined liability as to each claim.  The City objected, and the Court, with the parties' agreement, preserved the single-question format proposed by the parties.

detained by 13 officers, supported by a helicopter. Plaintiff was ordered prone on the ground, handcuffed for more than 20 minutes, searched, and questioned while surrounded by officers. Other officers also searched his vehicle and its contents. In addition, many of the officers pointed their firearms in Plaintiff's direction during a substantial part of the detention. While the City characterizes the officers as holding their guns "at the ready" or in the "low ready" position, the video recordings would permit the jury to find that at least some of the officers pointed their guns at Plaintiff, including while he lay prone on the ground. This evidence plainly permitted the jury to conclude that the force used against Plaintiff was severe.

Turning to the government interests, nothing about Plaintiff's behavior suggested the need for the level of force employed. Plaintiff was fully cooperative and gave no indication of being armed or threatening the officers. Plaintiff neither resisted arrest nor showed any suggestion of an intent to flee. And the Ninth Circuit in *Green* rejected the argument that "the existence of a stolen vehicle, in and of itself, is enough to satisfy the degree of force used," determining that "this is a conclusion over which reasonable jurors could disagree." *Id.* at 1048. The court explained that "[w]hile the crime at issue (stolen vehicle or plates) was arguably severe, there was no indication at the scene that [plaintiff] posed an immediate threat to the safety of the officers or others." *Id.* at 1050. Here, too, the officers' belief that Plaintiff was driving a stolen vehicle did not by itself compel the jury to find that the use of a high-risk stop was reasonable.

The City attempts to distinguish *Green* by arguing that the officers here had probable cause to believe the vehicle was stolen, whereas in *Green* there was a fact issue as to whether they had reasonable suspicion. But even assuming the City is right about the existence of probable cause, the excessive force inquiry focuses on whether the suspect poses a threat that may justify the need for force. In holding that a jury could find that the plaintiff did not pose a threat, the court in *Green* emphasized the nature of the suspected crime, rather than the strength of the evidence that the plaintiff had committed it. *See Green*, 751 F.3d at 1050 (assuming reasonable suspicion, rejecting argument "that the crime of vehicular theft is enough in itself" to justify high-risk stop, and noting that even though the crime was "arguably severe," there was no indication that plaintiff posed an immediate threat). An officer apprehending someone on suspicion of murder may take appropriate protective measures when approaching the suspect, and it is not obvious that the reasonableness of those measures turns on whether the officer has probable cause or merely reasonable suspicion. Conversely, absolute certainty that

a person has jaywalked, without more, would not justify arresting the person at gunpoint.[2]

---

[2] Indeed, the City's proposed approach to evaluating the reasonableness of safety precautions taken by officers would often be unworkable and potentially dangerous, especially when the line between reasonable suspicion and probable cause is not always clear. When safety is at stake and split-second judgments must be made, it is impracticable to demand that officers determine whether the basis for the detention rises to the level of probable cause or only reasonable suspicion before being able to protect themselves. The touchstone for determining the reasonableness of the force used to detain is the safety concern surrounding the detention, not the strength of the suspicion that triggered the stop. *See, e.g.*, *United States v. Edwards*, 761 F.3d 977, 982 (9th Cir. 2014) (focusing on safety concerns and finding that officers acted reasonably in pointing their weapons toward suspect, forcing him to kneel, and handcuffing him based on reasonable suspicion that he had been shooting at passing vehicles).

To be sure, the existence of probable cause is not wholly irrelevant to the question whether force is reasonable. "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). Moreover, courts have recognized that probable cause to believe a suspect has committed a violent crime bears on the reasonableness of an officer's use of force, *e.g.*, *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994), but it does not appear that they have focused on the distinction between reasonable suspicion and probable cause in this context. The Court is unaware of any decision holding that officers lawfully detaining a suspect believed to have committed a violent crime may use greater measures to protect themselves if their belief is based on probable cause than reasonable suspicion. Regardless, the existence of probable cause as to a violent crime is only one of the many factors to be considered in assessing the reasonableness of a particular use of force, and its relevance comes from the dangerousness of the suspected crime. *See, e.g.*, Model Civ. Jury Instr. 9th Cir. 9.25 (2024) (listing "whether there was probable cause for a reasonable officer to believe that the suspect had committed *a crime involving the infliction or threatened infliction of serious physical harm*" as one of 15 circumstances jury should consider in evaluating whether force used was excessive) (emphasis added). Even if this one factor weighed against a finding that the officers used excessive force in this case, that would not by itself necessitate overturning the jury's verdict.

The City cites no authority suggesting otherwise but instead asserts that no published case has ever found that the pointing of weapons was improper when the arrest itself was lawful.[3] That broad-sweeping assertion is incorrect. In *Thompson v. Rahr*, 885 F.3d 582 (9th Cir. 2018), an officer pulled the plaintiff over after observing him commit multiple traffic violations. The officer discovered that the plaintiff had a suspended license and was a convicted felon, including for the crime of possessing a firearm as a felon. After deciding to arrest him, the officer removed the plaintiff from the car, patted him down, called for backup, and had the plaintiff sit on the bumper of the police car under the watch of another officer while the arresting officer searched the plaintiff's vehicle. Upon finding a loaded revolver in the car, the officer drew his gun and, according to the plaintiff, pointed it at the plaintiff's head (the officer claimed he held the gun at the low-ready position). The Ninth Circuit affirmed summary judgment for the officer on qualified immunity grounds but first found a Fourth Amendment violation, concluding that pointing the gun at plaintiff was an excessive use of force because the plaintiff was compliant, had already been searched, and was 10–15 feet from the car containing the gun. *Id*. at 586–87; *see also id.* at 587 ("In the end, 'pointing guns at persons who are compliant and present no danger is a constitutional violation.'") (quoting *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009)). And although the court did not explicitly address the issue raised by the City, the officer in *Thompson* plainly had probable cause to arrest the plaintiff for being a felon in possession of a firearm, in addition to the traffic offenses. The City's argument is therefore unavailing.

As in *Green*, a reasonable jury could find that it was unreasonable to employ the degree of force used by the officers here—including pointing guns at Plaintiff while he lay prone on the ground surrounded by officers supported by a police helicopter—against someone who promptly and fully complied with the officers' instructions, did not appear to be armed, made no attempt to flee, and did not threaten the officers. At most, one of the three factors in considering the government's interest—the severity of the crime—might arguably support a finding of reasonableness, while the other two factors and the severity of the intrusion weigh heavily in favor of Plaintiff. Given both the fact-bound nature of the excessive force inquiry, which should rarely be taken from the jury, and the demanding standard for overturning a verdict under Rule 50(b), the Court cannot

---

[3] The Court does not decide whether this argument goes beyond the scope of the arguments raised in the City's Rule 50(a) motion, as it fails on the merits.

say that a single factor required the jury as a matter of law to conclude that the officers' use of force was reasonable.

The City argues that the law requires a contrary conclusion because the officers followed the training standards used for officers in California—particularly, Learning Domain 22 (LD 22) promulgated by the California Commission on Peace Officer Standards and Training, which addresses vehicle pullovers and the circumstances that may justify a high-risk approach. This argument fails on both the facts and the law. First, the jury heard competing evidence as to whether officers are trained (including pursuant to LD 22) to use high-risk stops every time they suspect that a vehicle may be stolen. The City's argument assumes that its reading of LD 22 as requiring a high-risk stop of any suspected stolen vehicle is the only possible reading and that officers are trained accordingly, but Plaintiff's expert offered a different opinion of LD 22's meaning and the training provided by law enforcement agencies throughout California, which the jury was free to accept.

Second, even accepting the City's position on the facts, compliance with statewide training does not preclude a constitutional violation as a matter of law (although it may help protect the officers from individual liability through the doctrine of qualified immunity, as it did here on summary judgment). The City's approach would neuter the Fourth Amendment, allowing private or governmental entities to decide what constitutes excessive force when developing statewide training and then precluding courts or juries from reaching a different conclusion as long as the officers followed that training. Apart from the general flaws in that approach, the City's specific argument also falters in the face of *Green*, since the Ninth Circuit expressly held that a jury could find excessive force where officers employed a high-risk stop based on a suspicion of a stolen vehicle. Thus, to the extent the City correctly reads LD 22 as directing the use of a high-risk stop on every suspected stolen vehicle, *Green* suggests that such a policy may be unconstitutional, at least as applied to situations where the suspect is compliant and nonthreatening.

In sum, the City has not shown that no reasonable jury faced with the evidence at trial could have found that Plaintiff was subjected to excessive force. "[W]hether a particular use of force was reasonable is rarely determinable as a matter of law," and this is not one of those rare cases. *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994). Because a reasonable jury under Ninth Circuit law could have found the City liable based on the officers' use of excessive force, the City's Rule 50(b) motion is denied.

8

III.

As the prevailing party, Plaintiff seeks to recover from the City $1,326,461.90 in attorneys' fees and $20,652.84 in non-taxable costs.  Dkt. Nos. 288, 299.  The Court addresses each request in turn.

A.

1.

Generally, the American legal system requires each party to pay its own attorneys' fees.  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010).  Under 42 U.S.C. § 1988(b), however, the Court may, in its discretion, award attorneys' fees to the "prevailing party" in an action brought under § 1983.  Although prevailing defendants face a stricter standard, a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."  *Thomas v. City of Tacoma*, 410 F.3d 644, 647 (9th Cir. 2005) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)).

As with other fee award statutes, courts determine the reasonable amount of attorneys' fees under § 1988 using the lodestar method.  *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006).  To calculate the "lodestar," courts multiply the number of hours the attorneys reasonably spent on the litigation by the reasonable hourly rate in the community for similar work.  *Id*.  The party seeking an award of fees must support its request with evidence of the hours worked and a basis for the rates claimed.  *Hensley*, 461 U.S. at 433.  After calculating the lodestar, courts may raise or lower the fee award based on several factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Ballen*, 466 F.3d at 746.  The figure derived from the lodestar analysis is presumed to be reasonable; courts are to adjust it only in exceptional cases.  *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000).

2.

Plaintiff prevailed against the City, obtaining a $150,000 jury verdict.  No special circumstances justify denying Plaintiff an award of fees.  The City does not seriously dispute that Plaintiff is entitled to an award of fees as the prevailing party, although it contends that Plaintiff's success was limited and that the amount of fees awarded should be drastically reduced for a variety of reasons.  Given Plaintiff's substantial success and the lack of any strong reason for denying fees, the Court finds that Plaintiff is a prevailing party and should be awarded attorneys' fees under § 1988.

In his motion, Plaintiff requested $1,281,966.90 in fees but noted that he would seek additional fees in connection with his reply brief.  Dkt. No. 288; Dkt. No. 289 at 14–15.  Together with his reply brief, Plaintiff then filed a declaration seeking an additional $44,495 in fees for work performed on and after the date the original motion was filed.  Dkt. No. 299-1 ¶ 12.[4]  Plaintiff has provided hundreds of pages of documentation in support of his fee request, including billing records reflecting more than 2,200 hours of work performed by 15 attorneys, law clerks, and legal assistants.  However, Plaintiff seeks to recover fees only for the work performed by the four main attorneys on this case:  partners Dan Stormer and Brian Olney and associates Catherine Choi and Rebecca Brown.  Plaintiff also voluntarily—and appropriately—made discretionary cuts to deduct certain hours

---

[4] The City objects to the supplemental declaration, citing the general rule that new evidence and arguments cannot be introduced in a reply.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").  The Court overrules the objection as to the evidence of additional hours billed after the filing of the motion; that evidence was anticipated in the motion itself (along with an estimate), and the specific hours could not have been documented before the work was actually done.  Moreover, the Court has scrutinized those requested fees (which amount to about 3 percent of the total requested fees) in light of the challenges the City has raised as to the entire fee request, obviating the need for any further briefing.  To the extent the supplemental declaration otherwise raises new arguments or evidence, the Court does not consider them.

related to matters and claims that were not taken to trial and then reduced his request by a further 10 percent to account for any potential billing errors or inefficient time. Dkt. No. 289 at 12–14 (Decl. of Dan Stormer). Although it is not clear from Plaintiff's table, this 10 percent reduction is applied to the billed hours.[5] After correcting for minor arithmetic errors and taking into account the 10 percent reduction in hours, Plaintiff's motion seeks to recover $221,004 for Stormer (157.86 hours at $1,400/hr); $624,575.25 for Olney (766.35 hours at $815/hr);[6] $203,325.75 for Choi (353.61 hours at $575/hr); and $231,052.50 for Brown (440.1 hours at $525/hr)[7]—a total of $1,279,957.50.[8] In connection with the reply, Plaintiff seeks $44,495 in additional fees for work performed on the motion the day it was filed and additional work preparing the reply and objecting to the individual Defendants' bill of costs, as follows: 1.2 hours for Stormer; 32.5 hours for Olney; and 31.1 hours for Brown. Dkt. No. 299-1 ¶ 12. Thus, the total fees sought by Plaintiff are as follows:

---

[5] The table in Stormer's declaration reflecting the fees they seek to recover shows the adjusted hours for each attorney before the 10 percent reduction and applies the 10 percent reduction in the final lodestar fee column for each attorney, but it also separately shows a 10 percent reduction of the total adjusted hours. Dkt. No. 289 at 13–14. While the table is not entirely clear, the declaration clarifies that the 10 percent reduction should be applied to the hours for which Plaintiff seeks compensation. *Id*. at 14 ("[T]o account for any inefficient time or billing errors, I have calculated reductions of 10 percent of all hours our firm spent after imposing the above-noted cuts.").

[6] Plaintiff's table miscalculates Olney's fees before the 10 percent reduction to be $694,013.50 rather than $693,972.50 ($815 x 851.5), and therefore mistakenly states that Plaintiff seeks $624,612.15 after the 10 percent reduction, rather than $624,575.25. This difference of less than $50 is immaterial in light of the further reductions made by the Court.

[7] Similar to the calculation for Olney, the calculation for Brown's hours contains a minor arithmetic error resulting in a difference of less than $30.

[8] Apart from the minor errors noted above, Plaintiff reaches a slightly higher figure by including in the table an additional $1,996.80 for "10% of fee motion." Dkt. No. 289 at 14. No explanation or justification of this sum is provided, and the Court disregards it.

| Attorney | Hours | Rate | Fees |
|----------|-------|------|------|
| Dan Stormer | 159.06 | $1,400/hr | $222,684.00 |
| Brian Olney | 798.85 | $815/hr | $651,062.75 |
| Catherine Choi | 353.61 | $575/hr | $203,325.75 |
| Rebecca Brown | 471.2 | $525/hr | $247,380.00 |
| **Total** | **1,782.72** | | **$1,324,452.50** |

a.

The Court begins its lodestar analysis with an analysis of the reasonable hours spent on this case. "The number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). The fee applicant bears the burden of "documenting the appropriate hours expended," but is "not required to record in great detail how each minute of his time was expended." *Hensley*, 461 U.S. at 437 & n.12. Counsel must at least "identify the general subject matter of his time expenditures." *Id.*

Plaintiff has adequately documented the hours sought above by providing full, detailed billing records of the work performed in this case. The City argues, however, that the hours should be reduced across the board by at least 50 to 60 percent based on Plaintiff's limited success, overlitigation of the case, inappropriate block billing, improper staffing, and the disproportionality of Plaintiff's requested fees to the verdict and Defendants' fees. The Court considers each argument in turn.

First, the City vastly understates Plaintiff's success, suggesting that because Plaintiff alleged nine causes of action against nine Defendants (which the City characterizes as a total of 81 claims) and only prevailed against the City on two of them, Plaintiff had a success rate of less than three percent. But as the Supreme Court held in *Hensley*, "[w]here a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." 461 U.S. at 440. In cases with unrelated claims based on different facts and legal theories, success on one claim does not entitle the plaintiff to recover fees incurred on another claim. But

> [i]n other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of

> counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.* at 435.

This is such a case. Plaintiff's claims all arise from a single encounter with LAPD officers on June 11, 2021. Plaintiff's various claims—both under § 1983 and state law—addressed essentially the same harm, and the vast majority of the work Plaintiff performed in this case applied to all claims. Many of these claims survived summary judgment, and Plaintiff's decision to streamline trial by voluntarily abandoning the remaining state-law claims and claims against the individual Defendants did not result in a failure to obtain redress for the harms alleged in those claims. Instead, the jury found that the officers violated Plaintiff's constitutional rights and held the City liable for those violations. Because Plaintiff's claims all "involve[d] a common core of facts," *id.*, Plaintiff's success at trial reflects success on his lawsuit as a whole. *See, e.g.*, *Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1177 (9th Cir. 2019) (en banc) ("All of Dr. Ibrahim's claims arose from her wrongful placement on the No Fly list, and are therefore related. Fees for each of these claims are thus recoverable."). Plaintiff has voluntarily excluded some of the time spent on issues related to the claims he elected not to take to trial, and the City has not shown that further reductions are warranted because the jury awarded Plaintiff a verdict based only on the two claims presented to it.

Second, the overlitigation of this case does not justify the enormous reduction in fees requested by the City. To be sure, this case was overlitigated. But the volume of disputes that should have been resolved without judicial intervention could not have occurred without the participation of both sides. And defense counsel bears at least an equal share of the responsibility for the intransigence that led to the proliferation of disputes. For example, Defendants' failure to produce discovery led to Plaintiff filing multiple successful motions with the magistrate judge. Dkt. Nos. 58, 62, 67. Discovery was further protracted because the City objected to discovery requests rather than simply disclosing—as it eventually did before trial—that it lacked the information Plaintiff sought. And Defendants elected not to make the same admission that they had made in a similar case against the City—that LAPD had a policy to conduct a high-risk traffic stop

based only upon suspicion of a stolen vehicle. Dkt. No. 288-1 at 42, 50 of 64. As a result, Plaintiff justifiably conducted discovery on and litigated this issue, obtaining a partial summary judgment ruling on it.

These are only a very small sample of the disputes between the parties that could have been resolved more efficiently. As they have done at every stage of this case, both sides point fingers at the other for the extent of the litigation, raising a host of complaints. But the Court need not address every dispute. *See Hensley*, 461 U.S. at 437 ("A request for attorney's fees should not result in a second major litigation."). To the extent that Plaintiff litigated this case more aggressively than it otherwise should have, it was a proportionate response to Defendants' hardball approach, and the Court does not find that a large reduction is warranted based on overlitigation. *See Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1109 (7th Cir. 1990) ("A defendant cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."). The Court takes into account the parties' aggressive litigation in making the small reduction addressed below.

Third, the City's complaint about block billing is overstated. Where a prevailing party improperly lumps together billing for multiple tasks, courts have authority to reduce the fee award "because block billing makes it more difficult to determine how much time was spent on particular activities." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007). Here, however, Plaintiff's billing records generally permit the Court to evaluate the tasks for which counsel billed. *See United Steelworkers of Am. v. Ret. Income Plan For Hourly-Rated Emps. of ASARCO, Inc.*, 512 F.3d 555, 565 (9th Cir. 2008) (rejecting challenge to fee award based on block billing where the time records were "sufficiently detailed for the district court to have made a determination of reasonableness"). And some of the City's specific complaints related to this argument are meritless—for example, that Plaintiff's counsel billed for time when they were required to be in Court (e.g., waiting for the jury's verdict) or for sitting through the Court's civil calendar while waiting for their motion to be reached. While Plaintiff's records do contain some entries that are vague or combine multiple tasks, they do not generally impede the Court's ability to evaluate the reasonableness of the fees sought. The Court makes a small adjustment for the limited block billing as part of its reduction below.

Fourth, the City argues that Plaintiff improperly staffed the case, unreasonably having more attorneys than necessary and having partners and associates bill for work which could have been accomplished by someone with a lower pay grade. The majority of the work in this case was done by Olney, who

was lead counsel.  The other partner in the case, Stormer, who has decades more experience and charges much higher rates, largely billed for his participation in the two trials.  Plaintiffs seek to recover fees billed by only two associates:  Choi, who assisted Olney in the early stages of the case, and Brown, who replaced Choi before trial.  While it is true that Plaintiff generally was represented by at least two attorneys at most court proceedings (and three at trial), the Court cannot conclude that it is inherently unreasonable for multiple counsel to work on the same case.  Plaintiff also never had more than one attorney take or defend a deposition, and Olney drafted most of the motions by himself.[9]  Plaintiff's staffing decisions are not so unreasonable that they justify a significant reduction in the fees awarded, particularly given the Ninth Circuit's admonition that a district court "may not attempt to impose its own judgment regarding the best way to operate a law firm, nor to determine if different staffing decisions might have led to different fee requests."  *Moreno*, 534 F.3d at 1115.

Finally, the size of Plaintiff's fee request relative to both the verdict and Defendants' fees does not warrant a reduction.  As the Ninth Circuit has explained,

> It is not per se unreasonable for attorneys to receive a fee award that exceeds the amount recovered by their clients.  This is especially true in civil rights cases, where the dollar amount lawyers recover for their clients is not the sole measure of the results the prevailing parties' attorneys obtained.  Attorneys who win a civil rights claim not only benefit their client in terms of the amount of money they recover, they also confer benefits on others throughout society by, for example, ending institutional civil rights abuses or clarifying standards of constitutional conduct.

*Gonzalez v. City of Maywood*, 729 F.3d 1196, 1209–10 (9th Cir. 2013) (cleaned up).  In addition to obtaining a substantial verdict of $150,000, Plaintiff successfully challenged the City's position that its policy of conducting high-risk stops on suspected stolen vehicles is necessarily constitutional in all applications.  Plaintiff's fees were high in large part because of Defendants' aggressive approach to this case, and because Plaintiff proceeded through two full jury trials.  The City

---

[9] Plaintiff used numerous law clerks to assist in research and the drafting of motions but is not requesting compensation for any of their time.  *See* Dkt. No. 289 at 8 (identifying more than 200 hours of law clerk time for which Plaintiff does not seek reimbursement).

does not suggest that Plaintiff could have obtained the relief awarded in the second trial in any other way; indeed, the City was determined to proceed to a second trial even after learning that seven of the eight jurors in the first trial leaned in favor of Plaintiff.

The City's comparison of defense counsel's fees to Plaintiff's fees is unavailing for two reasons. First, the comparison is somewhat misleading because defense counsel did not represent Defendants from the outset of the case, and he compares his firm's hours defending a portion of the case to Plaintiff's fees incurred through the entire case. More significantly, comparing the number of hours spent by the two sides "is simply not a valid quantitative measure to determine a reasonable number of hours." *Lozano v. City of Hazleton*, No. 3:06-CV-1586, 2015 WL 5895545, at *4 (M.D. Pa. Oct. 6, 2015). "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno*, 534 F.3d at 1112.

In sum, the Court does not find any basis for the 50–60 percent reduction in hours the City seeks. The Court does, however, find that a smaller adjustment is required to account for the fact that (1) Plaintiff's aggressive approach, while largely proportionate to Defendants' tactics, at times resulted in unnecessarily incurring fees; (2) a small number of Plaintiff's billing entries are block billed; (3) Plaintiff billed for some tasks for which a paying client generally would not expect to be charged (*e.g.* more than six and a half hours of work related to the transition from one associate to another, Dkt. No. 291 at 24–25 of 70); and (4) the hours billed for some tasks appear excessive (*e.g.* more than 40 hours to prepare the complaint, nearly 10 hours to prepare the joint Rule 26(f) report, and more than 27 hours on a motion to compel, *id.* at 7–12, 22–23 of 70). The Court recognizes that Plaintiff has already exercised some billing judgment by slightly reducing the hours for which he seeks to recover fees to account for inefficient time and billing hours, but the Court finds that a further reduction of 10 percent from the requested hours is warranted to account for the issues identified above. *See Moreno*, 534 F.3d at 1112 ("[T]he district court can impose a small reduction [to the requested hours], no greater than 10 percent—a 'haircut'—based on its exercise of discretion and without a more specific explanation.").

Accordingly, the Court applies a 10 percent reduction to the hours of each of the four attorneys for whom Plaintiff seeks an award of fees. The Court will therefore permit recovery for the following hours of work, which it finds were

reasonably spent on this case:  143.15 hours for Stormer; 718.97 hours for Olney; 318.25 hours for Choi; and 424.08 hours for Brown.

b.

The parties also dispute the reasonableness of Plaintiff's counsel's rates. "Reasonable fees under § 1988 are to be calculated according to the prevailing market rates in the relevant community, taking into consideration the experience, skill, and reputation of the attorney." *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005) (cleaned up).  The fee applicant bears the burden of establishing through "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates" align with the prevailing market rate. *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984).  The burden then shifts to the party opposing the fee application to submit rebuttal evidence. *Gates v. Deukmejian*, 987 F.2d 1392, 1397–98 (9th Cir. 1992).

All four counsel for Plaintiff appear to have strong credentials.  Stormer is a partner with nearly 50 years of practice experience who has tried numerous cases and argued once before the United States Supreme Court.  Dkt. No. 289 ¶¶ 2, 14; *id*., ex. 2 ¶ 2.  Olney is a partner with ten years of experience who has been lead counsel and co-counsel on at least three cases with seven-figure awards.  Dkt. No. 288-1 ¶¶ 3–10.  Choi earned her J.D. from Harvard Law School in 2018 and completed two federal clerkships.  Dkt. No. 289 ¶ 26.  At the time she performed work on this case in 2022, she had been out of law school approximately four years.  Brown graduated from UCLA Law School in 2020 and had been out of law school for approximately three years while working on this case in 2023.  *Id*. ¶ 27.

Plaintiff produces declarations of four attorneys from other firms who opine that Plaintiff's requested rates are reasonable.  Dkt. No. 288-2 (Olu Orange); Dkt. No. 288-3 (Bernard Alexander, III); Dkt. No. 288-4 (Robert Newman); Dkt. No. 288-5 (Barrett Litt).  As the City points out, all four attorneys have experience as plaintiff's lawyers in civil rights cases, and therefore may have some interest in obtaining court findings approving high rates.  Indeed, Orange has worked with Stormer and his firm on many cases and is currently co-counsel with Stormer on a different case against the City.  Dkt. No. 288-2 ¶ 24.  Thus, while the Court does not wholly discount their opinions that the rates Plaintiff seeks are reasonable, neither does it defer to them uncritically.  The Court also relies on its own knowledge and experience, as well as recent awards in similar cases, in assessing the reasonable rates to award.  *See Ingram v. Oroudijian*, 647 F.3d 925, 928 (9th Cir. 2011) ("Other circuit courts have held that judges are justified in relying on

17

their own knowledge of customary rates and their experience concerning reasonable and proper fees.  We agree.") (citations omitted); *United Steelworkers*, 896 F.2d at 407 ("[R]ate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate.").

Of the evidence produced by Plaintiff, the most helpful is the declaration of Barrett Litt, which includes tables of comparable rates—purportedly adjusted to present values—billed or awarded by other attorneys with similar experience levels in both the civil rights context and in general commercial litigation.[10]  While it is not obvious that these tables are representative of the average rates awarded to civil rights lawyers (currently or otherwise), they provide at least some objective data points.  Even compared against these rates, however, the rates Plaintiff seeks are at the high end of the range Litt reports for civil rights litigators—the appropriate comparators.  And the City argues that these rates are excessive, relying on cases in which lower rates were awarded.  Of these, the most pertinent is *Zeigler v. Cnty. of San Luis Obispo*, No. 17-CV-9295-MWF, 2023 WL 3432238, at *5 (C.D. Cal. Mar. 1, 2023), a fee decision in a § 1983 case from this district less than a year ago, in which Judge Fitzgerald awarded rates lower than those sought by Plaintiff here—including by reducing some associates' requested rates to $400 per hour. This Court agrees, based on its own experience and the awards in recent cases like *Zeigler*, that the high end of the ranges provided by Plaintiff does not provide the appropriate basis for a fee award in this case.

Stormer is a partner with considerable experience.  In his nearly 50 years of practice, Stormer has achieved notable recognition.  Plaintiff's own evidence states that Stormer's requested rate of $1,400 per hour is "on the high end" of rates for civil rights lawyers.  Dkt. No. 288-2 ¶ 24.  The Court finds that a rate of $1,050 per hour more appropriately reflects the market rate for a highly experienced partner like Stormer practicing civil rights law in the Los Angeles area.  *See Zeigler*, 2023 WL 3432238, at *5 (awarding $750 per hour to named equity partner in § 1983

---

[10] Most of the rates in Litt's tables for civil rights litigants are from more than a decade ago, and it is not obvious that Litt's adjustments to reflect present value are accurate.  For example, the only comparator for Stormer from the last year is Dale Galipo (also a highly experienced civil rights lawyer), and his rate is the lowest of the 20 comparator rates in the table, suggesting that Litt's projections from older rates may overstate the rates those attorneys would be awarded today.  Dkt. No. 288-5 at 17–18.

case and explaining that "[a]ccording to the Real Rate Report, litigation partners in the Los Angeles area make between $516 (first quartile) to $1,045 (third quartile) an hour, with a median rate of $725 per hour").

The $815 hourly rate requested for Olney, a partner with approximately 10 years of experience, is also on the high end even of the rates reflected in Plaintiff's evidence. *See* Dkt. No. 288-5 at 20–21 (table providing rates for partners with approximately 10 years of experience, with a median hourly rate of $786). Moreover, the Court finds that the rates provided by Plaintiff overstate the typical rates in the market. *See Zeigler*, 2023 WL 3432238, at *5 (stating that the median partner rate in the Los Angeles area is $725 per hour); *Ammari v. City of Norwalk*, No. 22-CV-01319-SSS, 2023 WL 8696334, at *3 (C.D. Cal. Sept. 28, 2023) (approving requested hourly rate of $286 for city attorney with more than 35 years of practice experience and noting that his regular rate was $675 per hour); *Marroquin v. Unidentified LAPD Officer*, No. 21-CV-07607-RGK, 2023 WL 5505061, at *4 (C.D. Cal. Apr. 24, 2023) (allowing hourly rate of $725 for a partner in § 1983 case after considering the 2018 Real Rate Report showing the median partner rate in Los Angeles as $650 per hour). Based on its experience, the evidence before it, and the rates awarded in other § 1983 cases in this district in the last year, the Court finds that an hourly rate of $725 is appropriate for Olney given the prevailing market rates for the Los Angeles area.

Choi and Brown are associates with approximately four and three years of experience, respectively, at the time of their work in this case. Choi's requested hourly rate is $575, while Brown's requested rate is $525. The objective evidence of comparators produced by Plaintiff does not include any rates awarded to third- or fourth-year associates since 2019. Last year, in *Ziegler*, Judge Fitzgerald found that litigation associates (not just young associates) in the Los Angeles area bill at rates between $400 to $855 per hour, with a median of $615 per hour. 2023 WL 3432238, at *5. He approved a rate of $550 per hour for a litigation associate with 11 years of experience who served as lead counsel, but he rejected a similar rate for two other associates for whom the plaintiff had not provided adequate information, awarding them $400 per hour instead. *Id*. Although Choi and Brown have strong credentials, they have far less experience than the 11-year associate who was awarded $550 per hour in *Ziegler*. Based on its experience and the award in *Ziegler*, the Court finds that hourly rates of $480 for Choi and $440 for Brown more accurately reflect the prevailing market rates for similarly experienced associates practicing civil rights law in the Los Angeles area.

Applying the hourly rates the Court has found reasonable for each attorney[11] to the billed hours the Court has found reasonable results in the following lodestar:

| Attorney | Hours | Rate | Fees |
|---|---|---|---|
| Dan Stormer | 143.15 | $1,050/hr | $ 150,307.50 |
| Brian Olney | 718.97 | $725/hr | $ 521,253.25 |
| Catherine Choi | 318.25 | $480/hr | $ 152,760.00 |
| Rebecca Brown | 424.08 | $440/hr | $ 186,595.20 |
| **Total** | **1,604.45** | | **$ 1,010,915.95** |

c.

The Court has already considered the City's argument for reducing Plaintiff's fee award in connection with its determination of reasonable number of hours to be compensated. The Court finds that the lodestar award of fees is appropriate, and that no additional factors render this an exceptional case in which further adjustments are warranted. Accordingly, Plaintiff is entitled to recover his reasonable attorneys' fees in the amount of $1,010,915.95.

B.

Plaintiff also requests non-taxable costs totaling $20,652.84.[12] Section 1988 permits a prevailing plaintiff to recover as part of an attorneys' fee award "those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (cleaned up). These out-of-pocket expenses must be reasonable. *See Dang*, 422 F.3d at 814. The City challenges the reasonableness of only four of the costs Plaintiff seeks to recover:

---

[11] The Court applies the same rate to all work performed by each attorney over the course of the litigation. *See Perdue*, 559 U.S. at 556 ("An attorney who expects to be compensated under § 1988 presumably understands that payment of fees will generally not come until the end of the case, if at all. Compensation for this delay is generally made either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.") (cleaned up).

[12] Plaintiff separately filed two applications to tax costs, which the clerk's office recently granted in large part, allowing $31,314.72 of the $32,269.44 requested. Dkt. No. 315.

(1) $5,346.30 in photocopying costs, (2) $838.43 in supplies and preparation costs, (3) $476.40 in trial expenses; and (4) $1,341.50[13] in airfare for Plaintiff's daughter.

Although reasonable photocopying costs are generally recoverable, the Court agrees with the City that the amount of costs sought is unreasonable on this record.  In the bill of costs, Plaintiff requested $3,032.69 for copies of documents filed and served, $6,351.34 for copies of documents or other materials admitted into evidence, and $2,598.60 for otherwise physically replicating or reproducing material.  Almost all these costs were allowed by the clerk of court.  Dkt. No. 315 at 4–9.  Plaintiff has not adequately shown that his request under § 1988 for an additional $5,346.30 in photocopying costs—bringing the total photocopying costs to approximately $17,000—is reasonable.  *See Harper v. City of Los Angeles*, No. 03-CV-959-CJC, 2006 WL 8446990, at *11 (C.D. Cal. May 16, 2006) (finding plaintiff had not met burden of demonstrating that photocopying costs were "reasonable and necessary for effective and competent representation" and awarding $8,663.25 instead of $17,326.50).  Accordingly, the Court declines to award the additional photocopying costs sought.

Nor does Plaintiff adequately explain the $838.43 he seeks to recover for "supplies and preparation."  In reply, Plaintiff supports this request by citing cases that permit the award of costs for telephone calls, postage, couriers, travel, online legal research, and photocopies.  Dkt. No. 299-1 ¶ 8.  But Plaintiff separately requests reimbursement for several of those categories of costs.  For example, Plaintiff requests $2,888 in messenger costs and $592.50 in milage and parking (neither of which the City opposes).  Dkt. No. 289 ¶ 40.  Even in his reply, Plaintiff has not adequately identified what is subsumed in the "supplies and preparation" he seeks to recover, nor explained why those are costs that would ordinarily be charged to a client.  Accordingly, the Court declines to award these unspecified costs.  *See Harper*, 2006 WL 8446990, at *12 (denying a request for costs that were "too vague to permit recovery").

The airfare for Plaintiff's daughter is also not recoverable.  Plaintiff contends that it was necessary for his daughter to fly from Chicago to Los Angeles because Plaintiff and his wife were both testifying at trial, but he cites no authority suggesting that the cost of non-testifying family members' travel is reimbursable under these circumstances or any evidence that such expenses would ordinarily be

---

[13] The parties provide slightly different numbers for Plaintiff's daughter's airfare. Plaintiff's evidence shows the correct amount to be $1,341.50.  Dkt. No. 289 at 176–81 of 211.

charged to a paying client.  Because Plaintiff has not met his burden to show that this expense is reasonably compensable, the Court further reduces the non-taxable costs by $1,341.50.

On the other hand, Plaintiff's request for $476.40 in trial expenses is reasonable.  Although the nature of these expenses was not initially clear, Plaintiff clarifies in connection with his reply brief that this sum consists of counsel's travel and parking costs.  Dkt. No. 299-1 ¶ 9.  Because travel costs are recoverable, *see Woods v. Carey*, 722 F.3d 1177, 1179 n.1 (9th Cir. 2013), and the amount requested to attend multiple hearings and two trials is not unreasonable, the Court awards Plaintiff the $476.40 requested.

Accordingly, the Court reduces the requested non-taxable costs by $7,526.23, resulting in an award of non-taxable costs in the amount of $13,126.61.

IV.

The City's renewed motion for judgment as a matter of law is DENIED.  Plaintiff's motion for attorneys' fees and non-taxable costs is GRANTED IN PART.  Plaintiff shall recover from the City his reasonable attorneys' fees in the amount of $1,010,915.95 and his reasonable non-taxable costs in the amount of $13,126.61.

Date: February 5, 2024

_____
Stanley Blumenfeld, Jr.
United States District Judge